## STREETER v. LOWE.

(Circuit Court of Appeals, First Circuit. January 24, 1911.)

No. 903.

1. BANKRUPTCY (§ 314*)—CLAIMS PROVABLE—GAMBLING TRANSACTION—STATE LAW—PROOF OF CLAIM.

Where a customer of a bankrupt who was a stockbroker filed a claim for a balance due on account of purchases and sales of stock, for the claimant's account, on the theory that the transactions were real purchases and sales, but the evidence showed that the creditor knew that the bankrupt was operating a bucket shop, and intended no real purchase or sale, the creditor was nevertheless entitled to the allowance of his claim for the amount of cash deposited with the bankrupt and interest thereon, under Rev. Laws Mass. c. 99, § 4, providing that whoever on credit or margin contract shall buy or sell securities or commodities intending that there shall be no actual purchase or sale, he may sue for and recover in an action on the contract from the other party to the contract any payments made, or the value of anything delivered on account thereof, etc.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

2. BANKRUPTCY (§ 341*)—CLAIMS—ALLOWANCE—AMENDMENTS—VARIANCE.

Where a creditor filed a claim against a bankrupt for an alleged balance of an account of purchase and sale of stock, on the theory that they were actual transactions and valid, but the evidence showed that the claimant knew that the bankrupt was running a bucket shop, and that neither intended a real purchase and sale, claimant was entitled to an allowance of his claim without amendment to the extent of the cash deposited and interest thereon as authorized by Rev. Laws Mass. c. 99, § 4; the statement of claim containing the necessary information from which such allowance could be made.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 341.*]

3. BANKRUPTCY (§ 455*)—CLAIM—PARTIAL ALLOWANCE—THEORY—DEFENSES—APPEAL.

A trustee's objection to the allowance of a creditor's claim for less than the amount demanded on a different theory from that on which the claim was founded, on the ground that costs would be thereby unjustly imposed upon the bankrupt's estate, in defending the creditor's

---

claim for the entire balance, was solely for the determination of the District Court, and would not be reviewed on appeal.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 455.*]

Appeal from the District Court of the United States for the District of Massachusetts.

Claim by Joseph D. Lowe for an alleged balance due him on the purchase and sale of stock of a bankrupt who prior to bankruptcy conducted the business of a stock trader. The claim was disputed by the trustee on the ground that the transactions were wagering contracts, and therefore invalid. This contention was overruled, and the claim allowed by the referee, who held that the evidence showed that the transactions were valid and real. On appeal to the District Court, the judge on review of the evidence sustained the contention of the trustee that the transactions were wagers, and reversed the ruling of the referee, but held that the claim should be allowed under Rev. Laws Mass. c. 99, § 4, for the amount of the sums paid to the bankrupt by the claimant, and from this determination the trustee appeals. Affirmed.

Frank W. Knowlton (Choate, Hall & Stewart, on the brief), for appellant.

Clarence W. Rowley, for appellee.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

LOWELL, Circuit Judge. We accept the finding of the learned district judge that the bankrupt was the keeper of a bucket shop, neither making nor intending real sales and purchases of stock, but only wagers on its price. We accept also his finding that the creditor understood that the transactions were wagers, and did not intend that the orders which he gave the bankrupt should be carried out by actual sale or purchase. The bankrupt rendered to the creditor accounts in which the transactions were treated as real sales and purchases, and in these accounts he entered also certain cash payments actually made as margins by the creditor to the bankrupt. The creditor's proof claimed "a balance due deponent from the bankrupt on account of the purchase and sale of stocks by the bankrupt for the account of the deponent and interest thereon according to the account hereto annexed." This account was that just mentioned as rendered by the bankrupt to the creditor. It showed a balance due the creditor of $4,739.72, increased by interest to $5,808.39. The items of cash deposited by the creditor amounted to $2,275, which came with interest to $3,130.40. The learned referee found that the creditor intended actual purchase and sale, and allowed his claim for the full amount. The learned district judge, as above stated, found that the creditor knew the nature of the bankrupt's business, and intended no real purchase or sale. He allowed proof for the amount of the cash deposited and interest thereon. The allowance was based upon Rev. Laws Mass. c. 99, § 4:

"Whoever upon credit or upon margin contracts to buy or sell, or employs another to buy or sell for his account, any securities or commodities, in-

tending at the time that there shall be no actual purchase or sale, may sue for and recover in an action of contract from the other party to the contract, or from the person so employed, any payment made, or the value of anything delivered, on account thereof, if such other party to the contract or person so employed had reasonable cause to believe that said intention existed: but no person shall have a right of action under the provisions of this section if, for his account, such other party to the contract or the person so employed makes, in accordance with the terms of the contract or employment, personally or by agent, an actual purchase or sale of said securities or commodities, or a valid contract therefor."

From the decision of the District Court the trustee appealed, alleging as error that the creditor was allowed to prove under the Massachusetts statute for the cash which he had deposited, while he had sworn, contended, and testified that he did not know the nature of the bankrupt's real business, and intended actual sale and purchase.

We concur with the district judge. The facts as found by him entitled the creditor, upon proper allegations, to recover the deposits and interest. The trustee contends only that the creditor is in some way prevented or estopped from asserting the proper consequences and liabilities arising from these facts. If this objection of the trustee were well founded, the defect in the proof would be merely formal, and, at the worst, allowance would follow upon the filing of a proper amendment. Hutchinson v. Otis, 115 Fed. 937, 941, 53 C. C. A. 419. But we do not think that an amendment is necessary. No objection to the form of proof was raised before the district judge. None has been argued in this court. "The practice in respect to proofs has always been liberal and free from technicalities." Lowell on Bankruptcy, § 221. It is true that the account annexed, made part of the proof, must be deemed to fail as to the items which set out the purchase or sale of stock. But those other items which show cash deposits by the creditor are correctly stated, and from these items, without alteration, can be ascertained the amount allowed by the district judge. Some items of the account have been allowed, others have been disallowed. That the account annexed is declared by the creditor to be based upon the purchase and sale of stocks does not vitiate those items which set out a valid claim.

The trustee has cited Standard Varnish Works v. Haydock, 143 Fed. 318, 74 C. C. A. 456, in which the Circuit Court of Appeals for the Sixth Circuit held that a creditor from whom the bankrupt had obtained goods by fraud could not recover the goods themselves after he had elected to affirm the sale by proving his claim and voting for trustee. There the creditor was entitled to elect either of two remedies under a given state of facts. Once having made his election he was not permitted to change it. In the case at bar there can be no election. If the creditor believed that the stocks were actually bought and sold, his only remedy was by proof on the account. If he intended that there should be no actual purchase or sale, his only remedy was by way of recovering his deposits under the statute. He alleged the first-mentioned state of facts, and sought the remedy provided in that case. The judge found the facts against him, and that finding of facts entitled him to recover his deposits which appeared in some of the items of the account annexed.

The trustee sought to defeat the allowance of the creditor's claim for deposits on the ground of the cost unjustly imposed upon the bankrupt estate in meeting the creditor's claim for the entire balance. This objection, however, affects only the question of costs in the district court, with which we here have nothing to do.

The decree of the District Court is affirmed, and the appellee recovers his costs of appeal.

NOTE.—The following is the opinion of Dodge, District Judge, in the court below, on petition by trustee for review of order by referee denying reconsideration of claim proved by Joseph D. Lowe.

DODGE, District Judge. The bankrupt in this case was doing business in September, 1902, as a stockbroker under the name of Braman & Co. The claim against his estate here in question was proved by Joseph D. Lowe, at the time also doing business as a stockbroker in Boston. From time to time, between September 4th and September 26th, Lowe gave orders to Braman for the purchase or sale of various stocks at current quotations. Braman kept an account current with Lowe between those dates, wherein Lowe was charged with the stocks he had ordered bought, as if bought, also with commission on purchases and sales and with interest, and was credited with the stocks ordered sold, as if sold, and also with certain amounts of cash which were deposited by Lowe from time to time as margins. On September 26, 1902, Braman closed his business and disappeared for a time from Boston. His petition in these proceedings was filed December 1, 1908.

The account above referred to has remained unsettled since September 26, 1902. It then showed a balance in Lowe's favor amounting to $4,239.72. This, with six years' interest, constitutes the claim which has been allowed, or $5,808.39 in all. The cash deposited for margins and included in the account amounts to $2,275, and, with interest thereon, constitutes $3,130.40 of the total amount allowed.

The trustee's objection to the claim is that wagering contracts are its only foundation, and it is, therefore, invalid. The bankrupt never did actually buy or sell any of the stocks, and it is sufficiently clear that he never intended to buy or sell any of them. Thus far there is little or no dispute. If it was also Lowe's understanding that there were to be no actual purchases or sales, the trustee's contention is established, and the claim ought to be reconsidered and rejected, so far as it consists merely of a balance in Lowe's favor resulting from the wagering transactions between the parties.

An account, annexed to the proof of claim presented, and accounts rendered by the bankrupt to the creditor from day to day, show in detail the daily transactions between the periods upon which the claim is based. There appear to have been transactions on 20 different business days, and more than 400 transactions in all, more than 200 of which were purchases, and more than 200 sales. Most of the purchases were in lots of from 10 to 50 shares, and involving amounts less than $5,000; but I find between 60 and 70 transactions in which the amounts involved were over $5,000, and in 10 of these instances the amounts involved were over $10,000. The aggregate amount involved in the purchases made September 4th to 6th, inclusive, was about $14,000; in the purchases September 8th to 13th, inclusive, about $79,000; in the purchases September 15th to 20th, inclusive, about $57,000; and in the purchases from September 22d to 26th, inclusive, about $750,000—making the aggregate amount of purchases about $900,000.

The accounts further show that the stocks ordered to be bought were, in nearly every case, ordered to be sold within a very short time afterward, in most cases on the same day, though in some instances the sale was delayed for a day or two. In no instance could they have been "carried" for more than a day or two, as is shown by the fact that, notwithstanding the very large amounts which would have been required for the actual purchase of the stocks charged in the accounts as purchased, and although the margin which the bankrupt required the creditor to deposit was only a margin of "three points, with five points kept good overnight," the total amount of in-

terest charged in the account, during the entire period of 22 days covered by it, was only $4.03. It appears, further, that the orders to purchase were given in view of the current telegraphic quotations of stock exchange prices, as these were from time to time received, and that the corresponding sales were thereafter ordered, generally speaking, as soon as these quotations disclosed a fluctuation of one-half a point in the quoted values of the stocks purchased; the instances in which it was delayed until the difference of a point was disclosed, being comparatively few in number.

The referee has found the creditor's intention to have been that the bankrupt "should buy and actually carry the stocks for him in accordance with the usual custom of brokers." He has further found that the bankrupt agreed to do this, represented that he was doing it, and that the creditor so believed. If this is true, the creditor must at least have intended that the bankrupt should make on his behalf, in the case of each purchase, a binding contract for the transfer of the stock bought or sold, and in the case of stock bought and not sold on the same day that there should be an actual transfer of the stock to the bankrupt, or some one representing him, upon payment of the purchase price; the bankrupt providing all funds required for the payment in excess of what the creditor had deposited with him as margin, and thereafter keeping the stock at all times, until its sale was ordered, ready for transfer to the creditor upon demand and settlement of the account between them. It is undisputed, not only that Lowe never received, but also that he never asked for, transfers of any of the stocks appearing in the accounts. None were, of course, ever received by the bankrupt, or by any one representing him, because, as stated above, the bankrupt never went so far as to make an actual contract for the purchase or sale of any of the stocks.

The evidence transmitted by the referee with his certificate shows the following facts: The bankrupt was not a member of any stock exchange, except the "Boston Mining and Stock Exchange," upon which none of these transactions could have been or were supposed to be executed. His transactions with Lowe were, as he gave Lowe to understand, to be executed on the New York Consolidated Stock Exchange, of which he was not a member, though he owned a seat, and was, through others, doing business upon it. Lowe had previously conducted a stockbroking business in Boston for several years, in the course of which he had dealt with Consolidated Stock Exchange brokers in New York, and had become thus familiar with the rules of that exchange and of stock exchange houses generally. He understood that the bankrupt was not a member of the exchange.

One thus familiar with the business of trading in stocks, engaging in a series of frequent daily transactions, consisting of orders to buy, followed immediately by orders to sell, the same stock, such as most of his transactions with the bankrupt were, must, of course, have known that no actual transfers would or could in such cases be made, and that the transactions must of necessity amount to mere bets upon the course of the market, won if the stock ordered went up, lost if it went down, and to be settled by payment of the difference between the prices at which the respective orders to buy and sell were filled. Whatever the conclusion might be as to the legality of such transactions, had there been a bona fide intention that there should be actually made in the case of each transaction a binding contract between members of the exchange above referred to, giving Lowe (or the bankrupt for him) the right to demand actual delivery of the stock bought in the remotely possible case that he should (as he never did) decide to exercise that right, instead of selling too soon to allow time for such delivery, they were clearly illegal in my opinion, unless it can be said that such actual contracts were really intended. The only question here being as to Lowe's intention, the nature of the transactions and the course of dealing between him and the bankrupt seems to me to raise a strong presumption that no such actual contracts were ever intended by him, any more than by the bankrupt.

Lowe's testimony before the referee was that he believed his orders were being executed, that the bankrupt so informed him, that he had no reason to think otherwise, and that it was his purpose and intention to have every share of stock he ordered purchased or sold in the stock market. But this testimony appears to be based upon the result of inquiries made by him

about the bankrupt's business and responsibility, and upon representations made by the bankrupt to him, before the account between them was opened and the dealings between them began. The real question is: Could he honestly have so believed, in view of what was done while this series of transactions was in progress? The following facts disclosed by the evidence, in connection with those already referred to, seem to me to forbid an affirmative answer to this question:

His orders, irrespective of the number of shares involved, for small lots as well as large, were reported filled at the "ticker" quotations, upon which they were based. These quotations represented the current prices for lots of 100 shares each. He understood and expected them to be thus filled, and objected if there was delay in reporting them as thus filled. It is not easy to credit him with a real belief that every one of the 10, 20, 30, 40, or 50 share lots which he ordered bought or sold was thus promptly bought or sold by actual contract on the exchange, at the quoted price for 100 share lots.

The commission charged by the bankrupt upon the transactions was a commission of $1/16$ only, or one-half the regular commission for an actual transaction upon the exchange. Unless Lowe believed that the bankrupt, though not a member, could get the orders executed on the exchange without charge, belief on his part that they were being actually executed would seem to have required the belief that the bankrupt was getting nothing for his own services in connection with them.

The amount of the margin which the bankrupt required of Lowe upon the transactions has already been referred to. It was so much less in amount than that ordinarily required when actual purchases and sales are intended, and so much less in amount than can be supposed adequate to protect the broker in bona fide transactions so numerous and extensive as those set forth in these accounts, as to afford to one whose experience in such matters had been what Lowe's appears to have been a strong indication that the bankrupt must be dealing with the orders given him just as he did, in fact, deal with them.

The "confirmation slips" transmitted by the bankrupt to Lowe set forth the transactions of each day, and each had printed upon it the express statement that "both parties intend to complete" (the purchases or sales) "by the actual receipt and delivery of all certificates thereof." But the decisions are numerous in which it has been held that recitals of this kind, made under such circumstances, so far from tending to establish the legitimate character of the transactions to which they refer, are strong indications to the contrary. See Re Baxter Co., 152 Fed. 137, 141, 81 C. C. A. 355.

Taking all the facts and circumstances into account, I am unable to believe that Lowe's intent, regarding the execution of his orders by the bankrupt, differed from that of the bankrupt himself. His testimony is not, in my opinion, sufficient to establish, against the indications to the contrary, an intent on his part that every order given should result in an actual contract. I am obliged to hold that the transactions were understood to be wagers, as in fact they were.

It follows, from this conclusion, that the claim cannot be allowed for the entire balance of the account. But as there is no question that the bankrupt not only had reasonable cause to believe, but knew, that the intention existed not to make actual purchases or sales, Lowe was entitled, by virtue of Rev. Laws Mass. c. 99, § 4, to recover from the bankrupt the amount of the payments made from time to time as margins.

The referee's order allowing the claim in full must therefore be vacated, and the claim allowed for the amount of $2,275, with interest.